UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
GLITZ TRADING, LLC,

Plaintiff,

- against -

BRENT SPICER, *et al.*,

Defendants.
---------------------------------------------------------x

**MEMORANDUM & ORDER**
25-CV-4668 (PKC) (RML)

PAMELA K. CHEN, United States District Judge:

This case arises out of a dispute among former business partners in the tattoo industry, who marketed and sold products under the trade name "Ink Beetle." (*See generally* Compl., Dkt. 1.) Plaintiff Glitz Trading, LLC ("Glitz") is a New York limited liability company that owns 40% of the alleged "Ink Beetle Partnership." (*Id.* ¶¶ 3, 9.) Defendants are Rebel Tattoo Company, LLC ("Rebel Tattoo"), Brent Spicer ("Brent"), and Christian Spicer ("Christian"), who collectively own the other 60% of the partnership. (*Id.* ¶¶ 4–6, 9.) Defendants have moved to dismiss the action in its entirety for failure to state a claim upon which relief can be granted. (*See* Mot. to Dismiss, Dkt. 24.) For the reasons explained below, Defendants' motion is denied.

## BACKGROUND[1]

### I. Factual Background

The parties here are all "active in the tattoo industry." (Compl., Dkt. 1, ¶ 10.) Rebel Tattoo is an Ohio limited liability company that is owned and operated by Brent Spicer (and, possibly,

[1] The following allegations are taken from the Complaint and documents attached to the Complaint as exhibits. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." (citations omitted)). For purposes of this Memorandum & Order, the Court assumes that all facts alleged in the Complaint

Christian Spicer). (*See id.* ¶¶ 6–7, 12–18.) Rebel Tattoo marketed and sold a line of tattoo aftercare products called "Ink Beetle." (*See id.* ¶¶ 6–7, 12–13, 32.)

In January 2024, "a distribution company with common ownership of" Plaintiff Glitz reached out to Brent to "offer to be a distributor for Ink Beetle," but Brent declined. (*Id.* ¶ 12.) Later that month, however, Brent reached out to Glitz to ask for "assistance with marketing and distributing Ink Beetle products." (*Id.* ¶ 13.) In February 2024, Brent met with Glitz's team[2] to discuss a possible collaboration, and Brent agreed to move forward with the venture. (*See id.* ¶¶ 14–15.)

In March 2024, Glitz began promoting Ink Beetle products, although the parties had not yet executed a formal written agreement. (*See id.* ¶¶ 16–22.) Later that month, one of Glitz's principals "drove from New York to Ohio to meet with the Spicers," and the parties began communicating about the terms of the written agreement. (*See id.* ¶ 18.) A draft Memorandum of Understanding ("MOU"), drafted by Brent, was circulated on March 20, 2024; it was finalized and fully executed on or about March 28, 2024. (*See id.* ¶¶ 21, 25.)

The MOU reads as follows (relevant portions excerpted):

> **MEMORANDUM OF UNDERSTANDING**
>
> This Memorandum of Understanding ("MOU") by and between Brent Spicer, Christian Spicer, and Rebel Tattoo Company LLC (collectively, "Rebel"), [and] Glitz LLC ("Glitz") (altogether, the "Parties") . . . is for the purpose of aligning intent and achieving objectives related to the development of Ink Beetle LLC, and any other form, name, trade name or d/b/a that may be elected (the "Company").

---

are true and draws all reasonable inferences in Glitz's favor. *See Peretti v. Authentic Brands Grp. LLC*, 33 F.4th 131, 133 n.1 (2d Cir. 2022) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

[2] Glitz, a limited liability corporation, has four members: Austin Werner, Qing Zhang, Sean Liao, and David Gutierrez. (*See* Compl., Dkt. 1, ¶ 3.)

WHEREAS, Rebel has established the Company for the purposes of providing tattoo paraphernalia and other related goods and services;

AND WHEREAS, Glitz approached Rebel about providing business development services to the Company in the capacity of a managing, minority Member in the Company;

THEREFORE, let this correspondence serve as a Memorandum of Understanding ("MOU") and bind the Parties in principal according to the following terms:

**INTENT**

Glitz shall provide business development, business management, social media management, consulting, market analysis, and any other related services for the Company, more specifically outlined as follows (altogether, the "Services"):

- Manage Company online sales platforms and seller pages (including but not limited to Shopify);
- Manage, handle, and ship sales inventory;
- Manage Company social media pages (including but not limited to Facebook, Instagram, and Tik Tok); . . .
- Consult and manage day-to-day business operations; . . . [and]
- Any other related or ancillary services necessary to carry out the above functions or as agreed upon by the Parties now or in the future.

In addition, Glitz[] shall fund forty percent (40%) of any new Company cost for obtaining a patent over specific commercially valuable product developments (the "Patent"), with an initial ten-thousand-dollar ($10,000.00) investment (altogether, the "Patent Investment"). The Parties shall both hold patent rights to any future Patent 60/40 in favor of Rebel.

As consideration for the above listed Services and Patent Investment, Rebel will provide Glitz sweat equity in the form of forty percent (40%) of the outstanding shares of the Company. . . . [3]

With respect to the Patent: the Patent shall be owned solely and exclusively by the Company, and all Parties hereto agree not to utilize, sell, license, or otherwise cloud or encumber Patent rights for personal benefit or for any other purpose other than in furtherance of the Company and its best interests. Any new patent(s) developed by any Party hereto after the effective date of this Agreement and in furtherance of

[3] The MOU also includes a "sweat equity transfer" provision stating that 20% of Glitz's equity would be guaranteed and the other 20% would be subject to total or partial clawback over a period of three years if the Company did not meet certain benchmarks for gross increases in sales. (*See* MOU, Dkt. 1-3, at 2.) The details of the sweat equity transfer/clawback provision are not relevant for purposes of this Memorandum & Order.

the Company's business and best interests shall belong to each Party on a pro rata basis according to each Party's ownership percentage of the Company.

**SIGNATURES**

INTENDING TO BE BOUND, the Members have executed this MOU and this Agreement is effective as of the date of its first writing:

REBEL TATTOO COMPANY, LLC:

3/28/24 Date By:

Date Authorized Representative Authorized Representative

GLITZ LLC:

3/25/24 Date By:

Date Authorized Representative Authorized Representative

CHARLES TINEO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01TI6444675
Qualified in Queens County
Commission Expires 12/05/2026

(MOU, Dkt. 1-3.)

Along with Glitz's signature on the MOU, Glitz sent Defendants $10,000 for the cost of obtaining a patent. (Compl., Dkt. 1, ¶ 21.) Glitz also paid a $4,000 charge to register the patent. (*See id.* ¶ 25.) Around March 28, 2024, Glitz "invested 40% [in] the first order of inventory . . . to start the relationship and begin selling"; Glitz's investment in that order was $7,906. (*Id.*)

Although the MOU states that Defendants "ha[d] established" an entity called "Ink Beetle LLC," they had not in fact established any formal entity prior to the MOU, and they did not create such an entity at any point after the MOU was executed. (*See id.* ¶¶ 20, 26, 34.) Glitz therefore contends that the parties' relationship was a "de facto partnership" for legal purposes (the

"Partnership"). (*See id.* ¶¶ 9, 26, 70.) In May 2024, the parties opened a joint bank account for the Partnership. (*See id.* ¶¶ 36–37.)

Between March 2024 and June or July 2025, Glitz performed according to its obligations in the MOU, marketing and selling Ink Beetle products. (*See id.* ¶¶ 35–63.) Glitz explains that the Ink Beetle product line had gross sales of approximately $50,000 total over the seven months of its existence prior to Glitz's involvement. (*See id.* ¶ 65.) Over the 15–16 months Glitz participated in marketing and selling Ink Beetle, the product had gross sales of approximately $500,000. (*Id.*) However, beginning around May 2024, the relationship between the parties began to deteriorate. (*See, e.g.*, *id*. ¶¶ 38–41.) In addition to not establishing an LLC, Defendants never transferred the patent(s) associated with Ink Beetle to the Partnership. (*See id.* ¶¶ 41, 45, 51.) Defendants also "participated very little" in the operation of the Partnership, and Defendants (Brent specifically) did not communicate much with Glitz. (*See id.* ¶¶ 34, 38, 40, 44, 47, 49–52.)

Glitz alleges that, around December 2024, Defendants began "actively impeding operations." (*See id.* ¶ 54.) In January 2025, Brent accused Glitz of "unclear expense reporting," but, in fact, it was Brent himself being "messy and disorganized." (*See id.* ¶ 56.) Around May 2025, "[i]t became clear that Defendants planned to change [their] shipping location" from Glitz's warehouse in New York to Texas, where Brent and Christian were residing. (*See id.* ¶¶ 4–5, 8, 20, 58.) Brent also "suggested that [Defendants'] need for [Glitz] was waning." (*Id.* ¶ 58.) Around the same time, Brent accused Glitz of "making improper charges of over $5,000" to the debit card for the Partnership bank account, which Glitz claims were actually "for advertising set up by [Brent] himself." (*Id.* ¶ 59.)

On June 13, 2025, Brent called a video meeting between the parties, at which Glitz claims Brent "made many false allegations and false claims about [Glitz]," and "seemed predisposed to

accusing [Glitz] of wrongdoing." (*Id.* ¶ 61.) Glitz disputed Brent's claims. (*Id.*) After this meeting, "Defendants went silent, did not respond to communications[,] and did not help with any issues relating to proximate inventory deliveries." (*Id.*) Finally, in July 2025, Defendants "unilaterally revoked all of [Glitz's] account access" without warning, "blocked [Glitz's] access to account portals and records," and "emptied the [Partnership] bank account." (*Id.* ¶ 63.) Glitz contends that these actions "made the breaches of the MOU irrevocable and constituted a wrongful dissolution of the Partnership." (*Id.*) Glitz estimates that Defendants took in excess of approximately $300,000 that belonged to Glitz, including profits, investments, and cash from the Partnership bank account. (*See id.* ¶ 65.)

On July 19, 2025, Defendants sent Glitz a "cease and desist" letter, "alleging general and unusually nonspecific malfeasance," which Glitz claims was "entirely incorrect." (*Id.* ¶ 66.) Nonetheless, Glitz complied with Defendants' request to return the Ink Beetle inventory that was in its possession and to cease marketing. (*See id.*)

## II. Procedural History

Glitz filed this action on August 22, 2025. (*See generally* Compl., Dkt. 1.) Glitz brings the following claims:

(1) <u>Breach of contract</u>, alleging that Defendants violated the terms of the MOU, (*see id.* ¶¶ 71–75);

(2) <u>Breach of duties under New York Partnership Law Article 4, Sections 40–44</u>, alleging that Defendants wrongfully terminated the Partnership, misappropriated Partnership assets, and engaged in other misconduct and mismanagement, (*see id.* ¶¶ 76–82, 83–93);

(3) <u>Breach of duties under common law</u> for the same conduct, (*see id.* ¶¶ 83–93);

(4) <u>Constructive fraud</u> for the same conduct, (*see id.* ¶¶ 94–98);

(5) <u>Unjust enrichment</u> for inequitably retaining the Partnership's funds, (*see id.* ¶¶ 99–102);

(6) Wrongful termination of the Partnership, (*see id.* ¶¶ 103–115);

(7) Denial of an accounting of Partnership assets, (*see id.* ¶¶ 116–22);

(8) Trademark infringement under the Lanham Act, 15 U.S.C. § 1114, alleging that Defendants are wrongfully using the "Ink Beetle Mark," (*see id.* ¶¶ 123–150); and

(9) Dilution of trademark under the Lanham Act, 15 U.S.C. § 1125, alleging the same, (*see id.* ¶¶ 151–61).

Glitz seeks damages, disgorgement of funds, the imposition of a constructive trust over Partnership proceeds held by Defendants, a judicial determination that Defendants wrongfully terminated the Partnership and that Glitz has the sole right to continue the business of the Partnership, an accounting of the Partnership, an order enjoining Defendants from infringing the Ink Beetle Mark, and an award of attorneys' fees and costs. (*See generally id.* ¶¶ 71–161.)

Defendants filed the instant motion to dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) on October 9, 2025. (*See* Mot. to Dismiss, Dkt. 24.) The motion is now fully briefed. (*See id.*; Mem. Supp. Mot. to Dismiss ("Mem."), Dkt. 24-1; Opp'n to Mot. to Dismiss ("Opp'n"), Dkt. 27; Reply Supp. Mot. to Dismiss ("Reply"), Dkt. 28.)

**LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing same at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting same). Determining whether a complaint states a plausible claim for relief is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

**DISCUSSION**

Defendants move to dismiss the Complaint on three grounds. First, Defendants argue that the Complaint should be dismissed entirely because the MOU and evidence annexed to Defendants' motion refutes Glitz's factual claims. (*See* Mem., Dkt. 24-1, at 3–4.) Second, Defendants argue that the Court should dismiss the claims against Defendant Christian Spicer because he did not sign the MOU and was never a member of Rebel, and that the Court should dismiss the claims against Defendant Brent Spicer because he did not sign the MOU in his individual capacity and the Complaint does not adequately identify how Brent was personally involved in the acts that form the basis for Glitz's claims. (*See id.* at 4–5.) Third, Defendants argue that the Court should dismiss Glitz's claims for "constructive fraud[,] . . . unjust enrichment[,] and quantum meruit," because quasi-contract claims are not available when a valid contract—here, the MOU—governs the same events, and because "[c]onstructive fraud must be pleaded with particularity under [Rule] 9(b)." (*Id.* at 6.) As set forth below, the Court disagrees with each argument.

**I. The MOU and Factual Evidence Regarding Glitz's Claims**

Defendants first argue, in effect, that the Court should dismiss this action because Glitz's factual allegations are not true. (*See* Mem., Dkt. 24-1, at 4; Reply, Dkt. 28, at 2–3.) They point to the MOU attached to the Complaint and claim that it does not establish "that it [was] Rebel Tattoo's obligation to form a new LLC." (Mem., Dkt. 24-1, at 1, 4.) But only one of Glitz's nine claims—the breach of contract claim—relies on Defendants' alleged failure to create the LLC, and even there, it is just one of ten different alleged breaches of the MOU. (*See* Compl., Dkt. 1, ¶ 72 (alleging that Defendants breached the MOU by failing to create the LLC, *in addition to* failing to

render performance of services set forth in the MOU, failing to register the intellectual property in the name of the LLC or the Partnership, wrongfully terminating the Partnership, exercising wrongful control over Partnership assets, etc.).) Thus, even if Defendants are correct that they were not contractually obligated to create an LLC under the MOU, that would not warrant the dismissal of any of Glitz's claims.

The Court also disagrees with Defendants' contention that the MOU unambiguously shows that they were not obligated to create an LLC. "For a defendant to prevail on a motion to dismiss for breach of contract, the contract must unambiguously support the defendant's position." *Prof. Fighters League, LLC v. Takeover Indus., Inc.*, 770 F. Supp. 3d 718, 724 (S.D.N.Y. 2025) (quoting *Trireme Energy Dev., LLC v. RWE Renewables Ams., LLC*, No. 22-CV-7439 (JLR), 2023 WL 5469662, at *12 (S.D.N.Y. Aug. 24, 2023)). A contract is unambiguous under New York law[4] "if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (citing *White v. Cont'l Cas. Co.*, 848 N.Y.S.2d 603, 605 (2007)).

---

[4] The MOU lacks a choice-of-law clause. Although neither party briefed the issue of the proper law to be applied to the breach of contract claim, both parties seem to assume that New York law applies to this dispute. (*See, e.g.*, Compl., Dkt. 1, ¶ 70 (Glitz alleging that New York partnership law applies and governs the "Company" defined in the MOU); Mem., Dkt. 24-1, at 4 (Defendants arguing that "New York follows the well established *contra proferentem* principle" (citation omitted)).) Additionally, a substantial amount of the conduct at issue occurred in New York. (*See* Compl., Dkt. 1, ¶¶ 8, 20 (explaining that the Partnership work was performed from Glitz's offices and warehouses in Queens, New York).) The Court therefore assumes that New York law governs. *See Trikona Advisers Ltd. v. Chugh*, 846 F.3d 22, 31–32 (2d Cir. 2017) (explaining that where the parties briefs assumed that a certain state's law applied, "such implied consent is . . . sufficient to establish the applicable choice of law" (ellipses in original) (quoting *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009))); *Vacold LLC v. Cerami*, 545 F.3d 114, 122–23 (2d Cir. 2008) (assuming that New York law governed where district court had done the same and neither party objected, and where a substantial amount of the conduct at issue underlying the dispute occurred in New York).

Here, the MOU states that it is "for the purpose of aligning intent and achieving objectives related to the development of Ink Beetle LLC . . . (the 'Company')." (MOU, Dkt. 1-3, at 1.) It then includes the following statement: "WHEREAS, Rebel has established the Company for the purposes of providing tattoo paraphernalia and other related goods and services . . . ." (*Id.*) Glitz's position is that this provision, though phrased in the past tense, establishes that it was Rebel Tattoo's obligation to create Ink Beetle LLC. (*See* Opp'n, Dkt. 27, at 3–4.) Glitz supports this interpretation with extrinsic evidence that Brent "represented that he would form a New York LLC and register it," (Compl., Dkt. 1, ¶ 20 (citing Compl. Ex. 4 ("Text Messages"), Dkt. 1-4)), and that he later told Glitz that he would set up the LLC in Texas instead, (*id.* ¶ 34). Defendants claim that, to the contrary, the MOU expresses "an intention that [Glitz] oversee the logistics of new LLC formation" because it provided that Glitz would "[c]onsult and manage [day-to-day] business operations" and provide "[a]ny other related or ancillary services necessary to carry out the above functions or as agreed upon by the Parties now or in the future." (Mem., Dkt. 24-1, at 4–5 (quoting MOU, Dkt. 1-3, at 1–2).)

The Court finds that the MOU does not "unambiguously support" Defendants' position. *See Prof. Fighters League*, 770 F. Supp. 3d at 724 (citation omitted). The statement that "Rebel has established the Company" might not be an explicit promise for Rebel Tattoo to establish the LLC, but it could reasonably be interpreted as a promise implied in fact. *See* 13 *Williston on Contracts* § 38:14 (4th ed. May 2026) ("Not only may promises exist . . . when the language is in the form of a promise but also when the agreement, according to its terms and context, shows that the parties must have intended an obligation even though they failed to set this forth in clear terms."); *see also Cordero v. Transamerica Annuity Serv. Corp.*, 190 N.Y.S.3d 274, 281 (2023) (explaining that, under New York law, courts will "infer that contracts include any promises which

a reasonable person in the position of the promisee would be justified in understanding were included at the time the contract was made" (citation and internal quotation marks omitted)). Since it is reasonable to interpret the MOU to include a promise by Defendants to create the LLC, the Court denies Defendants' motion to dismiss that portion of the breach of contract claim. *See also Prof. Fighters League*, 770 F. Supp. 3d at 724 ("While courts are not obliged to accept the allegations of the complaint as to how to construe a contract, they should resolve any contractual ambiguities in favor of the plaintiff on a motion to dismiss." (citation and internal quotation marks omitted)).

Defendants also claim that "text messages annexed" to Defendants' motion to dismiss "show that [Glitz], not [D]efendants, thwarted the filing of the LLC paperwork." (Mem., Dkt. 24-1, at 2.) The Court "do[es] not consider matters outside the pleadings in deciding a motion to dismiss for failure to state a claim." *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 202 (2d Cir. 2013) (citing *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 154–55 (2d Cir. 2006)). The Court therefore disregards this argument.

**II. Claims Against Christian and Brent Spicer**

Next, Defendants argue that the Court should dismiss the claims against Defendants Christian and Brent Spicer. As to Christian, Defendants argue that he "never signed the MOU, and never was a member of Rebel Tattoo or any entity that is or was involved in executing the MOU[']s terms." (Mem., Dkt. 24-1, at 2.) Defendants contend that, under principles of New York contract law, Glitz "cannot demonstrate that Christian accepted the agreement," and therefore he is not bound by the contract. (*See id.* at 4–5.) As to Brent, Defendants argue that he only signed the MOU in his official capacity on behalf of Rebel Tattoo. (*Id.* at 5.) Again, these arguments relate only to Glitz's breach of contract claim and would not, in any case, warrant dismissing either

Christian or Brent from this action, which alleges eight other non-contract causes of action, entirely.

The Court also disagrees with Defendants on the merits. The New York Court of Appeals "has long held that a contract may be valid even if it is not signed by the party to be charged" as long as there is "objective evidence establishing that the parties intended to be bound." *10 Ellicott Square Ct. Corp. v. Mt. Valley Indem. Co.*, 634 F.3d 112, 124 (2d Cir. 2011) (alterations adopted) (quoting *Flores v. Lower E. Side Serv. Ctr., Inc.*, 795 N.Y.S.2d 491, 494–95 (2005)); *see also Coliseum Park Apartments Co. v. Coliseum Tenants Corp.*, 742 F. Supp. 128, 133 n.4 (S.D.N.Y. 1990) (explaining that, under New York law, "parties may be fully and completely bound to a contract even if they do not sign it, if they act pursuant to it, or otherwise assent to it" (citing N.Y. Jur. 2d, *Contracts*, § 16)). When "differing inferences may be drawn" about the parties' intent, there is a question of fact, *see Flores*, 795 N.Y.S.2d at 495 (quoting *Brown Bros. Elec. Constr. v. Beam Constr. Corp.*, 393 N.Y.S.2d 350, 352 (1977)), which cannot be resolved on a motion to dismiss.

That is the situation here. The MOU, which Glitz alleges was drafted by Brent, (*see* Compl., Dkt. 1, ¶ 21), identifies both Christian and Brent as parties to the agreement in addition to Rebel Tattoo, (*see* MOU, Dkt. 1-3, at 1 ("This Memorandum of Understanding ('MOU') by and between *Brent Spicer, Christian Spicer*, and Rebel Tattoo Company LLC (collectively, 'Rebel'), [and] Glitz LLC ('Glitz') (altogether, the 'Parties') . . . ." (emphasis added))). That makes it more than plausible to infer that Brent and Christian intended to be bound by the agreement in their individual capacities. Whether that is actually true or not must be determined at a later stage, based on the evidence produced in discovery. *See Flores*, 795 N.Y.S.2d at 495 (citation omitted).

Defendants also argue that the Complaint "fails to specifically identify what the participation by Brent was in the acts that form the basis for [Glitz's] claims," and that, "[c]onsequently, the Court should dismiss all claims as against Brent." (Mem., Dkt. 24-1, at 5.) That argument is frivolous because the Complaint clearly sets forth detailed allegations regarding Brent's personal involvement. (*See, e.g.*, Compl., Dkt. 1, ¶¶ 19–22, 34, 41, 48, 52, 54, 59, 61.)

The Court therefore denies Defendants' motion to dismiss the breach of contract claim, or any of the other eight claims in this action, against either Christian or Brent Spicer.

**III. Constructive Fraud and Unjust Enrichment Claims**

Finally, Defendants argue that the Court should dismiss Glitz's claims for constructive fraud and unjust enrichment. (*See* Mem., Dkt. 24-1, at 6.)[5] The Court disagrees.

Starting with constructive fraud, Defendants state that "[c]onstructive fraud must be pleaded with particularity under [Rule] 9(b)." (Mem., Dkt. 24-1, at 6.) They do not elaborate or even attempt to apply that rule to Glitz's claim. The argument is therefore waived, and Defendants' motion to dismiss the constructive fraud claim is denied. *See Evans v. Select Portfolio Servicing, Inc.*, 827 F. Supp. 3d 422, 448 n.24 (E.D.N.Y. 2026) ("Where a party refers to an issue in only a perfunctory manner, unaccompanied by any effort at developed argumentation, it must be deemed waived—or, more precisely, *forfeited*." (citations omitted)); *Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) (summary order) (explaining that "when a party fails to adequately present arguments in a brief" before the court, the court "may properly consider those arguments abandoned," especially in cases where a party is represented by counsel (citation modified)); *United States v. Fuentes*, No. 09-CR-0143 (RJA) (JJM), 2012 WL 4754736, at *3 (W.D.N.Y. Apr.

---

[5] Defendants also state that the Court should dismiss Glitz's claim for "quantum meruit," (*see* Mem., Dkt. 24-1, at 6), but there is no independent claim for quantum meruit in the Complaint, (*see generally* Compl., Dkt. 1, ¶¶ 71–161).

25, 2012) (finding arguments waived where they were "largely conclusory, boilerplate, undeveloped[,] and bereft of any supporting case authority" (collecting cases)), *report and recommendation adopted*, 2012 WL 4754744 (W.D.N.Y. Oct. 4, 2012).

Defendants argue that Glitz's unjust enrichment claim should be dismissed because it is duplicative of Glitz's breach of contract claim. (Mem., Dkt. 24-1, at 6.) "A court may allow a breach of contract and an unjust enrichment claim to proceed past the motion to dismiss stage when the validity or scope of the contract is difficult to determine." *Nat'l Convention Servs., L.L.C. v. Applied Underwriters Captive Risk Assurance Co.*, 239 F. Supp. 3d 761, 795 (S.D.N.Y. 2017) (collecting cases); *see also id.* (explaining that, "even though [p]laintiffs may not ultimately *recover* under both the breach of contract and unjust enrichment claims, courts in this Circuit routinely allow plaintiffs to *plead* such claims in the alternative" (quoting *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 452 (S.D.N.Y. 2014))). Here, Defendants contend that "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter," and that "the parties do not dispute that the MOU exists and governs their relationship." (Mem., Dkt. 24-1, at 6 (citations omitted).) However, Defendants plainly *do* dispute the scope of the MOU—for example, they argue that it does not include an obligation to create an LLC, and that it does not bind Brent or Christian as individuals. (*See generally id.*) Thus, "[b]ecause the scope of the contractual obligations and further factual developments regarding the conduct of the parties have yet to be determined, dismissing [Glitz's] unjust enrichment claim at this stage would be premature." *See Nat'l Convention Servs.*, 239 F. Supp. 3d at 795 (citation omitted). Defendants' motion to dismiss Glitz's unjust enrichment claim is therefore also denied.

## CONCLUSION

For all of the foregoing reasons, Defendants' motion to dismiss, (Dkt. 24), is denied in its entirety.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 14, 2026
Brooklyn, New York